UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SERAPH MILLAR,

                        Docket No.:  7:22-cv-4749

                  Plaintiff,

       -against-                   **COMPLAINT**

KLEEBERG SHEET METAL, INC.,
TURNER CONSTRUCTION COMPANY,       *PLAINTIFF DEMANDS A*
JONATHAN SHEA, MICHAEL DEANGELIS,   *TRIAL BY JURY*
AND EDWIN FABER,

                  Defendants.
------------------------------------------------------------------------X

      The Plaintiff, SERAPH MILLAR, by her attorneys, Mitchell Pollack & Associates,

PLLC, as and for her Complaint in this action against the Defendants, KLEEBERG SHEET

METAL, INC., TURNER CONSTRUCTION COMPANY, JONATHAN SHEA, MICHAEL

DEANGELIS, and EDWIN FABER, respectfully alleges as follows:

### NATURE OF CLAIMS

      1.    This action is brought to remedy discrimination on the basis of sex and/or gender

in the terms and condition of employment and in the creation of a sexually charged, hostile work

environment, as well as, retaliation for opposition to unlawful practices, in violation of Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000, *et. seq.* ("Title VII"); the New

York State Human Rights Law, New York Executive Law, §290, *et. seq.* ("the Executive Law");

and any and all other causes of action arising under the federal and state constitutions and any

and all federal, state and local laws, based upon facts which are alleged and/or can be inferred

from the facts set forth herein.

      2.    The Plaintiff seeks injunctive and declaratory relief; monetary relief including,

but not limited to:  back pay, front pay, compensatory and punitive damages; bonuses, union

benefits, retirement benefits, seniority service credit/pension benefits, and all other benefits of

employment, damages for physical injuries and emotional distress, reasonable attorney's fees, and the costs of this action; and any and all other appropriate legal and equitable relief pursuant to applicable local, state and federal law.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 and §1343 and 42 U.S.C. §2000e-5(f)(3) because this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.  This Court has supplemental jurisdiction over the Plaintiff's related state court claims arising under the Executive Law and any and all state and local law pursuant to 28 U.S.C. §1367(a).

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District (White Plains) and the Plaintiff and at least one Defendant resides within the Southern District of New York.

5.      On or about March 26, 2021, the Plaintiff filed a charge of discrimination against the Defendants with the United States Equal Employment Opportunity Commission ("EEOC"), with a request to cross file the charge with New York State Division of Human Rights ("SDHR"), complaining of the sex/gender discrimination, sexual harassment, hostile work environment, and retaliation alleged herein.

6.      On or about March 17, 2022, the EEOC issued the Plaintiff a Notice of Right to Sue, which was later amended on or about March 18, 2022.

7.      The Plaintiff has commenced this federal lawsuit within ninety (90) days of the Plaintiff's receipt of the Notice of Right to Sue and as a result, the Plaintiff has fully complied with the administrative prerequisites of Title VII and all other applicable statutes.

## THE PARTIES

8.      The Plaintiff, Seraph Millar ("Millar"), is a 39-year old female/mother who resides in the State of New York, County of Orange, in the Southern District of New York.

9.      Ms. Millar is a member of the Sheet Metal Workers Union, Local 38 (the "Union") and, at all relevant times, was assigned to perform services for the Defendants, Kleeberg Sheet Metal ("Kleeberg") and Turner Construction Company ("Turner"), on the White Plains Hospital jobsite in White Plains, New York ("WP Hospital Project").

10.     The Defendant, Kleeberg, is a foreign business corporation registered to do business in the State of New York, with a principal place of business at 65 Westover Rd., Ludlow, MA 01056.

11.     Kleeberg is in the business of offering a wide range of both sheet metal and mechanical services and has employed greater than fifteen (15) employees for each working day, in each of the twenty (20) or more calendar weeks in the current or preceding calendar year.

12.     Kleeberg paid Millar's wages and qualified as Millar's employer pursuant to the definition contained in Title VII and the New York State Executive Law.

13.     At all times hereinafter mentioned, the Defendant, Jonathan Shea ("Shea"), is an individual residing in the State of Connecticut who is or was an employee, an agent, and/or a supervisor at Kleeberg, who was responsible for supervising Millar.

14.     At all times hereinafter mentioned, the Defendant, Michael DeAngelis ("DeAngelis"), is an individual residing in the State of Connecticut, and is or was an employee, an agent, and/or a supervisor at Kleeberg, who was responsible for supervising Millar.

15.     At all times hereinafter mentioned, the Defendant, Edwin Faber ("Faber"), is an individual residing in the State of New York, and is or was an employee, an agent, and/or a supervisor at Kleeberg.

16.     Faber was the project manager at the White Plains Hospital job site and had direct supervision over the Plaintiff as well as Shea and DeAngelis.

17.     The Defendant, Turner, is a domestic business corporation with a principal place of business at 375 Hudson Street, New York, NY 10014.

18.     Turner is a North America-based, international construction services company, and has employed greater than fifteen (15) employees for each working day, in each of the twenty (20) or more calendar weeks in the current or preceding calendar year.

19.     At all times hereinafter mentioned, Turner was the general contractor/upstream contractor with respect to the modernization and expansion project at White Plains Hospital Project, and Kleeberg was a subcontractor on the project.

**Turner Qualifies as a Joint-Employer:**

20.     As the general contractor on the WP Hospital Project, Turner exerted a significant measure of control over the activities of Kleeberg and its employees, and Turner's policies, oversight, and training requirements infiltrated the affairs of the employer employee relationship between Kleeberg and Millar to the extent of being a "joint employer".

21.     Turner maintains a "zero tolerance" and various equal employment opportunity policies prohibiting, *inter alia,* sexual harassment and gender discrimination on its jobsites, and not only were Turner's policies posted at the WP Hospital Project job site, but Millar and other subcontractor/vendor/trade employees were required to attend training seminars administrated by Turner with regard to such policies.

22.     Turner compelled Kleeberg employees, including the Plaintiff, to attend training with respect to its "zero tolerance" policy regarding vandalism and hate speech, and had the authority to remove Kleeberg employees from the jobsite for violating these policies, even though these individuals were being paid by Kleeberg.

4

23.     Turner required Kleeberg employees, including the Plaintiff, to attend sensitivity training while on the clock and being paid by Kleeberg.

24.     Upon starting at the WP Hospital Project, the Plaintiff was required to attend safety training with Turner employee, Juan, despite being paid by Kleeberg.

25.     Millar was compelled to sign a Turner document that stated that if Millar was hurt while working on the WP Hospital Project, she must file the worker's compensation claim under Turner's insurance policy and could only receive medical treatment from Turner's approved physicians, hospitals, and medical facilities.

26.     Millar was provided with a Turner ID badge and was required to clock in with Turner employees every morning before commencing her work.

27.     Millar interacted, on a daily basis, with Turner employees, e.g. "Don", "Evan" and Mike Crimi, and these Turner employees directly supervised the Plaintiff's job performance with respect to coordination with other trades, delivery dates and times, use of the elevator, receipt of change orders, and numerous other daily tasks.

28.     Turner had immediate control over how many Kleeberg employees were to be located on each floor and had the authority to send Kleeberg employees to other locations or home if such employees were violating policy or behaving inappropriately.

29.     Turner and Kleeberg employees worked jointly together and Turner held daily morning meetings to review tasks and anticipated hazards or safety concerns.

30.     Turner compelled Kleeberg employees to attend daily Task/Hazard analysis meetings and sign a dry erase board every morning before starting work.

31.     Turner held weekly foreman meetings in the hospital basement to review deadlines, hazards, change orders, and work moving forward.

32.     Turner required Kleeberg personnel to attend a September 11th "stand down" meeting to observe the remembrance tributes.

33.     The Plaintiff and Kleeberg employees were fully paid for attending Turner meetings, training seminars, "stand downs" and all such Turner compelled assemblies.

34.     Equipment and computers were shared between Kleeberg and Turner employees, including, but not limited to A-frames, dollies, tablets, and porta potties.

35.     Turner had immediate control over where Millar would be permitted to pump breast milk and the location, distance, and privacy aspects of the lactation stations.

36.     Turner oversaw all Covid-19 safety, contact tracing, and cleaning protocols including, sanitizing the Plaintiff's job site, hand tools, lifts, equipment, shoes, and porta johns with MediClean disinfectant.

37.     Turner's computer software programs dictated how issues with different trades when working in the same location were corrected to prevent, hazards/potential injuries.

38.     Turner had immediate control over the number of Kleeberg employees working on the job-site and often demanded additional personnel.

39.     Turner often moved Kleeberg employees, equipment, and material to different locations at the WP Hospital Project at its own behest.

40.     Turner administered discipline and intervened in disputes amongst Kleeberg employees and/or other subcontractors/trades, including claims of sexual harassment and discrimination.

41.     Turner dictated and supervised Millar's daily tasks and regulated what came on or off Kleeberg's Variable Air Volume (VAV) system.

42.     Millar complained to Turner administrators, "Justin", Samira Fowler ("Fowler"), and Noella Museminali ("Museminali"), about the gender discrimination, sexual harassment, and

hostile work environment she was being subjected to since she was told Turner had the authority to administer disciplinary procedures.

43.     Upon information and belief, after the conversation on November 3, 2021, Turner engineer, "Justin", influenced Millar's termination by relaying to Kleeberg and Turner that the male journeymen refused to listen to her.

44.     Upon information and belief, personnel with Turner and Kleeberg jointly made the decision to terminate Millar in retaliation for complaining about the discrimination and sexual harassment.

## FACTUAL ALLEGATIONS

### Millar's Work at the WP Hospital Project:

45.     On or about February 7, 2020, the Union contacted Millar and she was offered a position as a journeyman working at the WP Hospital Project.

46.     As a sheet metal journeyman, Millar's duties included installing and assembling products and systems made from sheet metal, such as HVAC ducts.

47.     Millar was trained and supervised by both Kleeberg and Turner and each entity was responsible for, *inter alia,* providing sexual harassment and other sensitivity type training; assigning tasks; directing and inspecting her daily activities; approving change orders; controlling the conditions of the worksite; providing tools, equipment, tablets, dollies, garbage cans; mediating and/or resolving disputes between tradespeople, vendors, suppliers, supervisors and administering discipline; handling complaints regarding the availability of private lactation locations; and addressing complaints concerning sexual harassment and gender discrimination.

48.     Both Turner and Kleeberg derived an economic benefit from Millar's labor and both had the authority to resolve her complaints.

49.     When Millar started as a journeyman at the WP Hospital Project, she was earning

approximately $38.00/hour and was entitled to various Union benefits under the collective bargaining agreement ("CBA"), including health and dental insurance, pension and profit sharing, and SASMI supplemental unemployment benefits with a value of approximately $43.53 per hour [total compensation $81.53 per hour].

50.    At the time she was terminated, Millar was earning $55.42/hour and the benefits were still valued at approximately $43.53/hour [total compensation $98.95 per hour].

51.    Prior to the events that led up to the filing this Complaint, Millar had always received positive reviews, met or exceeded the requirements of each position she held, including being promoted twice while working on the WP Hospital Project.

52.    Millar first day of work on the WP Hospital Project was February 10, 2020.

**Accommodation Requests to Turner and Kleeberg re. Private Room to Pump Breast Milk:**

53.    When she commenced work on the WP Hospital Project, Millar notified her Kleeberg supervisor, DeAngelis, that she was still breastfeeding her newborn and required a private location to pump milk every 3-4 hours.

54.    DeAngelis directed her to speak with Turner Safety Floor Supervisor, Mike Crimi, who took her into the Hospital to find access to a lactation room.

55.    Once the Covid-19 pandemic heightened, she could no longer access the Hospital, so Turner instructed her to pump in the office of Turner employee, "Juan".

56.    This office was unacceptable since it did not have a lockable door, so the Plaintiff complained to supervisors at both Kleeberg and Turner.

57.    Instead of simply putting a lock on the convenient office space, Turner directed her to a lockable room that was approximately an 8 minute walk (each way) from where she was assigned to work.

58.     This inconvenience not only lengthened the amount of time she would be away from the crew, but it brought more attention to her taking pumping breaks.

59.     Millar overcame this impediment, however, and on February 14, 2020, Supervisor Shea recognized that she had taken on a leadership role and advised her that due to her performance, she was being promoted to foreman.

60.     Nonetheless, Shea requested that she coordinate her pumping schedule with the crew's scheduled breaks, since the men goofed off while she was away.

61.     While it is painful for a female to delay pumping at greater than 3-hour intervals, Millar accommodated this request, since she wanted the foreman promotion and the pay increase to approximately $43.00/hour.

**Millar's First Promotion to Foreman:**

62.     On March 6, 2020, Millar's promotion to Foreman was formally announced.

63.     As a Foreman, she had the added responsibilities of, among other things, overseeing 8-19 crew members, making sure the daily assignments were being carried out, and coordinating with other Turner employees and trades working in the same general vicinity.

64.     On or about March 12, 2020, the Turner WP Hospital Project was temporarily halted due to the New York State Covid-19 restrictions and, until the site was deemed an "essential" construction project, the crew could stay home.

65.     Millar returned to work on April 18, 2020, and the Foreman pay upgrade took effect the week of April 21, 2020.

66.     Almost immediately upon assuming the Foreman position, certain male journeyman began disrespecting Millar and referring to her as the "girl boss".

67.     The major participants in the discriminatory and sexually charged conduct included Kleeberg journeymen, Dan Vail ("Dan"), Mike "Stripes" Barrow ("Stripes"), Fidel

Alvarez ("Fidel"), Henri Gjonaj ("Henri"), John Mule ("Mule"), Bryant "Peewee" Cruz ("Peewee") and Jeff Warren ("Jeff") (collectively referred to as the "Harassers").

68.     Millar had a practice of keeping notebooks and/or calendars for each job, where she would write down colleague's names; significant assignments; hours, breaks and pumping times; certain appointments; communications and issues that arose during the Project, etc. and as the sexual harassment and discrimination became more consistent, the entries were documented almost daily and grew more detailed in nature.

69.     On April 27, 2020, her notebook reflects that she gave instructions to Kleeberg journeymen, Stripes, Jeff and Henri, and was told "[n]o, you are not my boss, leave us alone."

70.     On April 29, 2020, she requested that Fidel "mud corners" and fix the clips he missed; but he became loud and insubordinate, started yelling at her, and stated that he knows how to do his job.

71.     Fitters who were working next to Fidel, told Millar that when she walked away, he called her a "bitch" and uttered that "women should not be in construction."

72.     On April 30, 2020, Fidel told her to "talk like a lady" during a safety meeting.

73.     Millar objected to the chauvinistic comment by telling Fidel to get his "sexist self" back to work, but this type of behavior continued without redress by Kleeberg or Turner.

**Millar's Learns She is Receiving a Second Promotion to General Foreman:**

74.     While the comments and insubordination began as minimally obstructive, they grew more and more intolerable once the Harassers learned that Millar was going to be named General Foreman ("GF"), when the crew grew to 20 members.  Jimmy Brissling ("Jimmy B.") would then be promoted to take her position as foreman.

75.     Harasser, Vail, was particularly upset that he was not going to receive a foreman's pay upgrade, and referred to Millar as "nasty" on multiple occasions, particularly when she asked him to finish the connections he missed.

76.     On May 4, 2020, Stripes and Henri ignored her instructions and Jeff told her, again, that she is not his boss and he will never listen to a woman foreman.

77.     Millar reported this conduct to her Supervisor, Shea, however, Shea appeared to condone their behavior by telling her to just leave them alone since they do not like when she directs them to do things [*i.e.* – to do her job as foreman or GF].

78.     On May 13, 2020, DeAngelis and Shea notified Millar that a 20th person would be added to the crew and she was officially being promoted to GF, with another pay raise that ultimately grew to $55.42/hour at the time she was terminated.

79.     That week, the Harassers' comments about the "girl boss" became so insufferable that crew member, Rob Arnald ("Rob A."), informed Millar that he had enough and was going to tell them to knock it off and get over it.  Unfortunately, this peer pressure tactic did not work.

80.     On June 12, 2020, "Rich", a foreman with S&L Plumbing and Heating Corp. ("S&L"), and one of their fitter apprentices, "Mena", both told the Plaintiff that the crew on the 5th Floor [where the Harassers were primarily working] were referring to her as "bitch", "cunt" and "nasty" after she assigned the tasks for the day.

81.     These repulsive words were used to describe the Plaintiff on a daily basis, and the S&L crew members told her that the Harassers would say it so loudly that all the tradespeople on the Project could hear it; and they were disgusted by how the Harassers behaved.

82.     On June 17, 2020, Turner employee and elevator shop steward, "Mike", also tried the peer pressure tactic, by talking to the Harassers, again.  Fidel, the sheet metal shop steward,

acknowledged that they could lose their jobs if the conduct continued, but the sexually charged discrimination persisted.

83.    On June 23, 2020, Henri called her a "mother fucker" several times.

84.    On June 29, 2020, the Defendant, Shea, witnessed Vail refer to her as a "nasty" woman multiple times, and did nothing to admonish this behavior, and appeared to condone it.

**The "Petition" and Formal Complaints:**

85.    On June 30, 2020, Millar spoke with Union representative, Michael Colombo ("Colombo"), about the problems she was having with the Harassers.  She complained to Colombo about the connotation of the word "nasty" and how Vail uses that word in the same vein as "bitch" or "cunt".

86.    It is well known that the phrase "nasty woman" was popularized during the 2016 presidential campaign and is meant to degrade women in the very same way that gender demoralizing terms such as "bitch" and "cunt" are received.

87.    Millar told Colombo that this sexually charged harassment and gender disparagement needed to stop.  While Colombo agreed the behavior was inappropriate, he did not do anything about it.

88.    This type of behavior continued throughout the summer, and then on July 23, 2020, one of Millar's crew told her that a petition was being circulated to remove her as GF (the "Petition").

89.    Peewee spoke about the Petition in front of Shea and DeAngelis and this particular crew member; yet, the Individual Defendants did nothing to curtail it.

90.    Millar complained to the Kleeberg supervisors, Shea and DeAngelis, but they merely passed it off as a Local 38 Union issue and did nothing to address the Petition or stop the inappropriate conduct.

91.     Shea and DeAngelis were often present at the diner or other crew meal locations where the Harassers would disparage Millar and complain about the "girl boss" in their presence.

92.     Shea and DeAngelis' failure to remediate this behavior during social meals, effectively condoned the improper, condescending conduct on the jobsite, and seemed to aid and encourage the conduct to continue.

93.     On July 24, 2020 and July 25, 2020, the Plaintiff contacted Colombo, again, to seek assistance from the Union, but he did not return her calls.

94.     Jimmy B. tried to pressure Colombo and Fidel to determine who started the Petition, but this led to Columbo ultimately suggesting that Millar "talk sweeter to the guys" so that she does not offend them.

95.     Millar objected, responding that he would never tell one of the male foreman to "talk sweeter" to anyone, and that any tone she may have with them resulted from having to tell the Harassers to do something five or six times before they would eventually do it.

96.     On or about August 3, 2020, Millar confronted Peewee at approximately 7:00 a.m., to ask if he started the Petition; however, he stated that he had only overheard Shea and DeAngelis discussing it.

**Millar Meets with Union and Kleeberg Supervisors:**

97.     At 9:00 a.m. on August 3, 2020, the Plaintiff was called into a meeting with Shea, DeAngelis, Colombo and Fidel and, again, she was told that the men did not like to be reprimanded or given instructions by a woman and that she should "talk nicer" to them.

98.     The Plaintiff protested these types of misogynistic statements, and she specifically questioned Shea and DeAngelis as to whether they would be having the same conversation if she was a male foreman.

99.     This was the perfect time for the sexist, insubordinate behavior to be shut down;

13

yet, Shea and DeAngelis just stood there and stared at her, without saying a word.

100. At 10:30 a.m. that same day, DeAngelis told Millar that management thought she was doing a great job, but he refused to admonish the Harassers or offer any assistance in stopping the sexual harassment.

101. Throughout August 2020, the Harasser's continued to challenge Millar by refusing to wear their hard hats, fall protection harnesses, and safety glasses (collectively "PPE"), goofing off, shopping online, playing on their phones, taking unnecessary risks and uttering the offensive comments.

102. When she performed her job as GF and brought these violations to their attention or sought assistance from the Defendants, the offensive sexist behavior amplified.

103. On August 11, 2020, ten (10) crew members were discharged; however, instead of laying off the Harassers who were lazy, disruptive, and creating the hostile work environment, the individuals who were cooperative and did their jobs without obstruction were terminated. This included Kleeberg foreman, Jimmy B., who had opposed and spoke out about the sexist, discriminatory behavior towards Millar.

104. The sexual harassment and insubordination persisted throughout August 2020, and more men began notifying Millar about what was being said during crew lunches in the presence of Shea and DeAngelis, and the derogatory names she was being called when she walked away.

105. Millar believed that the Harassers were intentionally performing poorly to attempt to set her up to fail, and foreman, Tom H. ("Tom H."), advised her that Mike "Stripes" Barrow even threatened to have the Columbian mafia "take care of her".

**Complaints to Turner Construction:**

106. On September 1, 2020, the Plaintiff lodged complaints with Turner engineers,

Fowler and Museminali, in accordance with Turner's purported Zero Tolerance policies.

107.    Millar shared the contents of her notebook with these Turner engineers and pointed out where she documented significant interactions with the Harassers and the sexist, degrading names she was being called on a daily basis.

108.    Turner and Kleeberg both had actual knowledge of the Plaintiff's complaints; yet failed to take any action to remedy the gender discrimination and sexually charged, hostile work environment.

109.    On September 3, 2020, during the morning meeting, DeAngelis spoke to the crew about the "bickering" going on.  This was the first time any of the Kleeberg supervisors addressed the Harassers' behavior, but it was intentionally minimized and seemed to only occur because the executives at Turner were formally put on notice of the conduct.

**The September 4, 2021 Meeting with Turner, Kleeberg and Union:**

110.    On September 4, 2020, Millar initiated a meeting with the Turner executives, Fowler and Museminali, as well as Project Manager, Faber, and Union representative, Colombo, to formalize her complaints and seek a solution, so that she could perform her duties without suffering sexual harassment and discrimination.

111.    Rather than take action in compliance with its own policies and the law,  the Turner executives put the onus on Millar to decide how the Harassers would be disciplined. Ultimately, this resulted in no action being taken.

112.    Thereafter, the Plaintiff pulled the Defendant, Faber, aside and advised him that she believed Shea and DeAngelis were participating in the harassment, and by simply disregarding the sexist behavior and affronts that occurred during lunch breaks; they were condoning it on the job site.

113.    The meeting caused Millar further anxiety, since it was management's

responsibility to correct the conduct she complained about and what discipline was appropriate; yet the onus was being put on her to come up with a solution, and Faber was pretending that he did not know what had been happening.

114.    Neither Kleeberg nor Turner took responsibility to combat the sexual harassment. The only proposed solution, at that time, was to move Millar and the non-troublemaking crew to work in the basement, leaving the Harassers the preferred floor.

115.    Two foreman, Tom H. and Rich C., spoke with DeAngelis about Stripes' behavior, but these foremen told Millar that they were afraid to take any further action since it was assumed that Jimmy B. was terminated for speaking out against the Harassers.

**The Masturbation Gesture Incident:**

116.    On September 17, 2020, Millar instructed Peewee to get a pallet jack.  Peewee adamantly said "no" and then pretended to masturbate in her direction.

117.    Millar reported these repulsive gestures to the Defendant, Shea, and sought assistance in convincing Peewee to cease being insubordinate and offensive; but the inappropriate conduct continued.

118.    The Plaintiff also reported to Shea that the crew members were perpetually late, refused to put on PPE, and were always on their phones.  Shea simply suggested that they take a "good cop, bad cop" approach and that he would handle the "bad cop" role.

119.    During a meeting on September 18, 2020, Shea spoke to the crew about being on time and not using phones during the day, but there was no mention of the insubordination or sexist behavior toward Millar.

120.    On October 16, 2020, John Mule ("Mule"), a sheet metal apprentice, was working over a shaft without a hardhat, fall protection harness, or safety glasses and Millar instructed him to come down and put on the PPE.  Mule refused, stating that he was a "great worker" and

mumbled that he does not have to listen to her.

121.   When Millar returned to that area later on, Mule was again working without PPE. She directed him to put on the PPE, but he continued to be willfully insubordinate.

122.   Millar told Shea that if he was going to be "bad cop," then he needed to address the insubordination.  Mule was observed without PPE again on October 23, 2020, and on multiple dates/times thereafter.

123.   On October 30, 2020, "Dennis", a GF for plumbing subcontractor, Grundman Mechanical Systems, Inc., pulled Millar aside and gave yet another report about how Vail and Peewee disparaged her every time she walks away.

**Further Complaints to Turner and Kleeberg:**

124.   Millar contacted Turner executive, Fowler, to discuss the continuing abuse. Fowler advised that she would speak with Shea and DeAngelis, but Millar heard nothing further.

125.   Even after multiple meetings and numerous complaints to Turner and Kleeberg, the degrading names, sexually charged conduct, and insubordination continued and the Turner "zero tolerance" policies were useless.

126.   On November 2, 2020, Vail responded to the Plaintiff's job-related question by punching her on her hardhat and saying "no".  Millar objected and told him to never lay his hands on her again.

127.   The next day, Millar directed Stripes and another crew member to move all the equipment to another area.  Stripes defiantly ignored the Plaintiff's instructions and then pulled Turner floor supervisor, "Justin", aside to question Millar's instructions.

128.   Justin appeared bothered by this intrusion and Shea and DeAngelis failed to return her calls when she tried to report Stripes' defiance.

129.   Millar discussed the Harasser's inappropriate conduct with Justin to seek his

assistance in remedying it, however, upon information and belief, Justin's irritation with the Harasser's disrespect of Millar led to the Plaintiff's abrupt termination.

**Millar Contracts Covid-19:**

130.    Later that day on November 3, 2020, Millar had a 104.8 degree fever and did not feel well, so she continued trying to contact Shea and DeAngelis multiple times.  They did not answer their phones on any of these occasions, or return her calls.

131.    The Plaintiff's fever was still present on November 4, 2020, so she visited her doctor and was originally diagnosed with strep throat.  She left messages for Shea and DeAngelis that she would be out sick until her fever broke, but they did not return her calls.

132.    On November 5, 2020, her fever was at 103.7 degrees, but there was still no response from Shea and DeAngelis when Millar attempted to notify them.

133.    The Plaintiff returned to work on Monday, November 9, 2020, and the 5th Floor job site looked the same as when she left, since the crew had done nothing with respect to installing the duct work while she was out.

**Millar is Summarily Terminated:**

134.    That morning, Shea and DeAngelis summoned her to meet with them and she was summarily terminated.

135.    Millar asked why she was being fired when the Harassers who are late every day, do not listen, and play on their phones all day, continue to work.  There was no response.

136.    Upon information and belief, Turner floor supervisor Justin's annoyance with the Harassers' refusal to listen to Millar on November 3, 2021 and the Kleeberg crew bothering him influenced the decision to terminate the Plaintiff.

137.    Upon information and belief, both Kleeberg and Turner executives participated in the decision to summarily terminate Millar from the GF position, and, to date, she has not been

given a reason for her abrupt termination.

138.    Millar contacted Colombo, but the Union refused to pursue a grievance or do anything to fight the termination, discrimination and/or retaliation.

139.    Despite paying her Union dues, Millar realized she would receive no support from the Union because Colombo also represented the Harassers.

140.    At no point prior to her abrupt termination, did Kleeberg or Turner advise her of any performance issues nor was she ever reprimanded or disciplined for any policy violation.

**Millar Initiates Covid-19 Contact Tracing:**

141.    Later that day, Millar's fever returned and this time the doctor tested and confirmed that she had contracted the Covid-19 virus.

142.    On November 11, 2020, the Plaintiff called Shea and DeAngelis to notify them that she tested positive for Covid-19, out of concern for her coworkers who she had been in contact with on Monday.

143.    Certain crew members had borrowed her pen during the Turner required sign-in on November 9, 2020 and they were always permitted to help themselves to items she kept in her toolbox/cart, so she wanted to make sure all the proper precautions were taken.

144.    She also called, Oni, a Turner GF, seeking the phone numbers for Juan, the Turner safety coordinator, and Scott, the Turner employee in charge of Covid-19 issues, so that she could let them know about her diagnosis.

145.    Bizarrely, despite a rampant pandemic, the safety coordinator did not believe she had Covid-19 and kept pressuring her to prove it.  Millar was offended since she had just been terminated and believed her medical records were private.

146.    She was told that the Department of Health would notify her former employer because contact tracing was in place at that time, but she decided to call Kleeberg in good faith,

so that there were no delays in taking the proper precautions and to encourage others to get tested, if applicable.

147.    On November 12, 2021, she emailed the test results to Turner's Safety Superintendent with the proviso that they only share it on an as needed basis.

**Retaliation and Inability to Obtain Comparable Employment:**

148.    Millar recovered from Covid-19 and remained out of work, until Union business agent, James Nestor ("James N."), called her on January 22, 2021, to see if she would be interested in a GF position with Kleeberg overseeing a project at Kingston Hospital.

149.    Miller accepted the assignment, but on January 25, 2021, James N. notified Millar that Kleeberg decided it did not want her running the Kingston project.

150.    Despite having seniority over other Union members, Millar has been unable to secure a comparable GF position or even continuous journeyman/foreman assignments since she was terminated from the WP Hospital Project.

151.    To date, the retaliatory termination has poisoned the Plaintiff's standing in the Union and the discriminatory and retaliatory conduct has continued to prevent the Plaintiff from obtaining and maintaining suitable employment, on a regular basis.

152.    Due to the stress and anxiety she endured working at the WP Hospital Project under these horrific conditions, as well as being unemployed for such a long period of time, the Plaintiff has required extensive chiropractic care and treatment for physical injuries and emotional distress.

153.    As a result of the foregoing, the Plaintiff has suffered and continues to suffer economic loss, emotional distress, physical injuries, chiropractic injuries, humiliation, anxiety, mental and physical pain and suffering, loss of employment-related opportunities, pension, retirement and other benefits, seniority, and experiences and damage to her reputation and career.

### THE FIRST CLAIM FOR RELIEF
### Discrimination and Harassment in Violation of Title VII
### (Against Kleeberg and Turner)

154.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs 1 through 153 of this Complaint as if fully set forth herein.

155.    Both Kleeberg and Turner had immediate supervision and control over Millar's daily activities; maintained policies against discrimination and sexual harassment with authority to directly administer discipline; kept track of her hours and location on the jobsite; and provided insurance for hazards and injuries that occurred on the WP Hospital Project, and as such, both Kleeberg and Turner qualify as the Plaintiff's employers under Title VII.

156.    By the acts and practices set forth above, including but not limited to: creating and/or encouraging and condoning a hostile work environment for the Plaintiff and other female employees because of their sex/gender and ignoring the Plaintiff's continual complaints of discrimination and sexually charged harassment, Kleeberg and Turner discriminated against the Plaintiff in the terms and conditions of her employment in violation of Title VII.

157.    Kleeberg, Turner, Shea, DeAngelis, Farber, Fowler, Museminali and "Justin", and others from both companies had actual or constructive knowledge of the Harasser's sexual harassment, the threats, insubordination and discriminatory conduct toward Millar based upon her sex and/or gender as well as the circumstances that created the hostile work environment.

158.    The employees of Kleeberg and Turner, including but not limited to, Shea, DeAngelis, Farber, Fowler, "Justin" and Museminali, each had a duty to act on such actual knowledge and prevent, eradicate and/or remedy the harassment and discriminatory conduct.

159.    Shea, DeAngelis, and Farber are sufficiently high enough in the Kleeberg management hierarchy and are charged with the duty to act on their knowledge and stop the harassment and/or to inform Kleeberg or Turner of same.

160.     Fowler, Museminali, and "Justin" are all sufficiently high enough in the Turner management hierarchy and are charged with the duty to act on their knowledge and stop the harassment and/or to inform Turner or Kleeberg of same.

161.     Kleeberg, Turner, Shea, DeAngelis, Farber, Fowler, Museminali and "Justin" had an individual, affirmative duty to investigate and/or remedy the complaints of the Plaintiff.

162.     Kleeberg, Turner, Shea, DeAngelis, Farber, Fowler, Museminali and "Justin", had actual or constructive notice of Millar's complaints, but failed to take prompt remedial action, eradicate the Harasser's behavior and/or reprimand any of them, in any fashion.

163.     The Defendants were on notice that there was a likelihood that the Harasser's proclivities would place Millar and other women at an unreasonable risk of sexual harassment and/or discrimination based upon prior complaints and incidents involving these same crew members.

164.     As a direct and proximate result of the hostile work environment and these Defendants' unlawful discriminatory conduct and acts in violation of Title VII, the Plaintiff has suffered and will continue to suffer irreparable injury, damage to her career and reputation, monetary and/or economic harm, including but not limited to:  loss of past and future income, wages, compensation, seniority/service credit, pension, retirement, and other benefits of employment for which she is entitled to an award of monetary damages and other relief.

165.     As a direct and proximate result of the hostile work environment and these Defendants' unlawful discriminatory conduct and acts in violation of Title VII, the Plaintiff has suffered and will continue to suffer severe mental and physical anguish, including but not limited to:  emotional distress, stress, anxiety, humiliation, embarrassment, physical injury, chiropractic injuries, emotional and physical pain and suffering, loss of self-esteem and self-confidence, and depression, for which she is entitled to an award of monetary damages and other relief.

166.    The unlawful discriminatory actions by Kleeberg, Turner, and any and all agents of the Employers were intentional and with reckless disregard to the Plaintiff's federally protected rights and, as such, constitute malicious, willful and wanton violations of Title VII for which she is entitled to an award of punitive damages.

**THE SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII**
**(Against Kleeberg and Turner)**

167.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs 1 through 153 of this Complaint as if fully set forth herein.

168.    By the acts and practices set forth above, and, more particularly, participating and/or condoning the Harasser's sexual harassment, insubordination and inappropriate behavior; improperly increasing and/or reducing the Plaintiff's job responsibilities; ignoring her complaints; and terminating her employment without justifiable reason, in response to her continuous complaints and requests for assistance in rectifying the gender discrimination and sexual harassment, Kleeberg and Turner retaliated against Millar for her opposition to unlawful employment practices in violation of Title VII.

169.    As a direct and proximate result of these Defendants' unlawful retaliatory conduct in violation of Title VII, the Plaintiff has suffered and will continue to suffer irreparable injury, damage to her career and reputation, monetary and/or economic harm, including but not limited to: loss of past and future income, wages, compensation, seniority/service credit, pension, retirement, and other benefits of employment for which she is entitled to an award of monetary damages and other relief.

170.    As a direct and proximate result of these Defendants' unlawful retaliatory conduct and acts in violation of Title VII, the Plaintiff has suffered and will continue to suffer severe mental and physical anguish, including but not limited to:  emotional distress, stress, anxiety,

humiliation, embarrassment, physical injuries, emotional and physical pain and suffering, chiropractic injuries, loss of self-esteem and self-confidence, and depression, for which she is entitled to an award of monetary damages and other relief.

171.     The unlawful retaliatory actions by Kleeberg, Turner, and any and all agents of the employer were intentional and with reckless disregard to the Plaintiff's federally protected rights and, as such, constitute malicious, willful and wanton violations for which she is entitled to an award of punitive damages.

**THE THIRD CLAIM FOR RELIEF**
**Discrimination and Harassment in Violation of the New York Executive Law**
**(Against All Defendants)**

172.     The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs 1 through 153 of this Complaint as if fully set forth herein.

173.     By the acts and practices set forth above, including but not limited to:  creating, participating in, encouraging, inducing, condoning, authorizing and/or ratifying the sexual harassment, gender discrimination and hostile work environment suffered by the Plaintiff and other female employees because of their sex and ignoring the Plaintiff's continual complaints of discrimination and sexual harassment, the Defendants discriminated against Millar in the terms and conditions of her employment in violation of the New York Executive Law.

174.     Even if it is ultimately determined that Turner is not a joint-employer, New York Executive Law §296-d provides that it is unlawful for an employer to permit unlawful discrimination against non-employees, including subcontractors, in its workplace; thus, Turner may be held liable to the Plaintiff for violations of the Executive Law.

175.     Kleeberg, Turner, Shea, DeAngelis, Faber, Fowler, Museminali, and "Justin" had actual or constructive knowledge of the sexually charged harassment, threats and/or

discriminatory conduct toward Millar based upon her sex and/or gender as well as the hostile work environment.

176.    The Defendants had a duty to act on such actual knowledge and prevent, eradicate and/or remedy the sexual harassment and discriminatory conduct of the Harassers.

177.    The Defendants, Shea, DeAngelis, and Faber, had an individual, affirmative duty to investigate and/or remedy the complaints of the Plaintiff.  It was not objectively reasonable for these Defendants to believe that their actions did not violate the clearly established statutory or constitutional rights of the Plaintiff.

178.    The Defendants had actual and/or constructive notice of Millar's complaints but failed to take prompt remedial action, eradicate the Harasser's behavior and/or reprimand them in any fashion; and thereby participated, condoned and/or encouraged the discrimination and sexually charged work environment.

179.    The Defendants were on notice that there was a likelihood that the Harasser's conduct and proclivities would place other women at an unreasonable risk of sexual harassment and/or discrimination based upon prior complaints and incidents involving Millar.

180.    The Individual Defendants aided, abetted, incited, compelled and/or coerced the sexual harassment and discrimination against the Plaintiff and the commission of such unlawful discriminatory employment practices and are personally liable for their actions under the "aiding and abetting" clause of the Executive Law.

181.    The Defendant, Turner, aided, abetted, incited, compelled and/or coerced the commission of such unlawful discriminatory employment practices and permitted the sexual harassment and gender discrimination of the Plaintiff to occur on its worksite; thus, Turner is also liable for its actions and inaction under Executive Law §269-d.

182.    As a direct and proximate result of the hostile work environment and these

Defendants' unlawful discriminatory conduct and acts in violation of the Executive Law, the Plaintiff has suffered and will continue to suffer irreparable injury, damage to her career and reputation, monetary and/or economic harm, including but not limited to:  loss of past and future income, wages, compensation, seniority/service credit, pension, retirement, and other benefits of employment for which she is entitled to an award of monetary damages and other relief.

183.    As a direct and proximate result of the hostile work environment and these Defendants' unlawful discriminatory conduct and acts in violation of the Executive Law, the Plaintiff has suffered and will continue to suffer severe mental and physical anguish, including but not limited to:  emotional distress, physical injuries, chiropractic injuries, stress, anxiety, humiliation, embarrassment, emotional and physical pain and suffering, loss of self-esteem and self-confidence, and depression, for which she is entitled to an award of monetary damages and other relief.

### THE FOURTH CLAIM FOR RELIEF
### Retaliation in Violation of the New York Executive Law
### (Against All Defendants)

184.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs 1 through 153 and 172 through 183 of this Complaint as if fully set forth herein.

185.    By the acts and practices set forth above, and, more particularly, participating and/or condoning the Harasser's sexual harassment, insubordination and inappropriate behavior; improperly increasing and/or reducing the Plaintiff's job responsibilities; ignoring her complaints; and terminating her employment without justifiable reason, in response to her continuous complaints and requests for assistance in rectifying the gender discrimination and sexual harassment, Kleeberg and Turner retaliated against Millar for her opposition to unlawful employment practices in violation of the Executive Law.

186.    As a direct and proximate result of these Defendants' unlawful retaliatory conduct

26

in violation of the Executive Law, the Plaintiff has suffered and will continue to suffer irreparable injury, damage to her career and reputation, monetary and/or economic harm, including but not limited to:  loss of past and future income, wages, compensation, seniority/service credit, pension, retirement, and other benefits of employment for which she is entitled to an award of monetary damages and other relief.

187.    Kleeberg, Turner, Shea, DeAngelis, and Faber, all intentionally retaliated against Millar for her complaints in opposition to the unlawful employment practices and harassed and intimidated the Plaintiff by condoning, participating in and/or encouraging the Harasser's discriminatory, threatening, sexually charged, improper behavior.  It was not objectively reasonable for these Defendants to believe that their actions did not violate the clearly established statutory or constitutional rights of the Plaintiff.

188.    The Individual Defendants aided, abetted, incited, compelled and/or coerced the retaliation against the Plaintiff and the retribution she faced for reporting the commission of such unlawful discriminatory employment practices and are personally liable under the "aiding and abetting" clause of the Executive Law.

189.    As a direct and proximate result of these Defendants' unlawful retaliatory conduct and acts in violation of the Executive Law, the Plaintiff has suffered and will continue to suffer severe mental and physical anguish, including but not limited to:  emotional distress, stress, anxiety, humiliation, embarrassment, physical injuries, chiropractic injuries, emotional and physical pain and suffering, loss of self-esteem and self-confidence, and depression, for which she is entitled to an award of monetary damages and other relief.

190.    As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the Executive Law, the Plaintiff has suffered and will continue to suffer irreparable injury, damage to her career and reputation, monetary and/or economic harm,

including but not limited to: loss of past and future income, wages, compensation, seniority/service credit, pension and service credit benefits, and other benefits of employment for which she is entitled to an award of monetary damages and other relief.

191. The unlawful retaliatory actions by Kleeberg, Turner, the Individual Defendants, and any and all agents of the employers were intentional and with reckless disregard to the Plaintiff's rights under the Executive Law and, as such, constitute malicious, willful and wanton violations.

### THE FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

192. The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in Paragraphs 1 through 191 of this Complaint as if fully set forth herein.

193. Based on the foregoing, the Defendants have engaged in conduct toward the Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society as it was done in a deliberate, callous, malicious and oppressive manner with the intent to harm the Plaintiff; was with an evil motive amounting to malice, spite, animosity and bias; and was done in conscious disregard of the Plaintiff's rights.

194. Among other behavior, the Defendants' pervasive pattern of sexual/gender harassment, discrimination, and retaliation, both in the underlying claims and in the manner by which Millar was abruptly terminated, together with the tolerance and encouragement of the hostile, sexually charged and abusive treatment of the Plaintiff and other women working for Kleeberg and Turner, constitutes extreme and outrageous conduct that exceeds the bounds of decency in a civilized society.

195. By their actions and conduct, the Defendants intended and did intentionally or recklessly cause the Plaintiff to suffer and continue to suffer humiliation, anxiety, physical harm,

chiropractic injuries and severe emotional distress.

196.    As a direct and proximate result of the Defendants' conduct, the Plaintiff has

suffered and continues to suffer severe emotional distress, for which she is entitled to an award

of monetary damages and other relief.

197.    The Defendants' extreme and outrageous conduct was knowing, malicious,

intentional, willful and wanton, entitling the Plaintiff to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, Seraph Millar, prays for judgment against the Defendants,

jointly and severally, as follows:

A.    Declaring that the acts and practices complained of herein are in violation of Title

VII, the Executive Law, and all other applicable local, state and federal laws;

B.    Enjoining and permanently restraining the Defendants from continuing to engage

in such unlawful employment practices and from further violating the Plaintiff's rights in the

future by, *inter alia,* providing negative, misleading and/or disparaging references pertaining to

the Plaintiff's employment and/or inaccurately maintaining the Plaintiff's personnel file.

C.    Directing the Defendants to take such affirmative action as is necessary to ensure

that the effects of these unlawful employment practices are eliminated and do not continue to

affect the Plaintiff's employment opportunities, including the removal of all letters of reprimand

and associated negative documentation from the Plaintiff's personnel file;

D.    Directing the Defendants to place the Plaintiff in the position she would have

been in but for the Defendants' discriminatory and retaliatory treatment of her, and to make her

whole for occupational and reputational damage, including but not limited to restoring her

personnel file and position to the state it was prior to reporting the unlawful employment

practices and/or actively assisting the Plaintiff in her efforts to obtain future employment;

E.     Awarding damages, in an amount to be determined at trial, plus prejudgment interest, to compensate the Plaintiff for all monetary and/or economic damages, including but not limited to, back pay, front pay, additional wages and compensation, bonuses, equity and/or seniority interests, out-of-pocket expenses, pension/retirement benefits, service credits, raises, health insurance reimbursements, life insurance and/or any and all other benefits of employment;

F.     Awarding damages, in an amount to be determined at trial, plus prejudgment interest, to compensate the Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for mental anguish, humiliation, embarrassment, stress, anxiety, physical injuries, chiropractic injuries, pain and suffering, and emotional distress;

G.     Awarding damages, in an amount to be determined at trial, plus prejudgment interest, to compensate the Plaintiff for the harm to her professional and personal reputations and loss of union service credit and career fulfillments;

H.     Awarding punitive damages to deter the Defendants and others from engaging in similar conduct, to the fullest extent permitted by law;

I.     Awarding the Plaintiff the costs and disbursements she has incurred in this action, including witness and expert fees;

J.     Awarding reasonable attorney's fees to the fullest extent permitted by law;

K.     Awarding the Plaintiff such pre and post judgment interest as is permitted by law;

L.     Granting such other and further relief, both special and general, as this Court

deems just and proper and to which the Plaintiff may be justly entitled.

Dated:  Tarrytown, New York
          June 7, 2022

                                        MITCHELL POLLACK & ASSOCIATES, PLLC
                                        Attorneys for Plaintiff, Seraph Millar

                                        /s/ *Eileen M. Burger*

                          By.:         _____
                                        Eileen M. Burger, Esq. (EB3002)
                                        150 White Plains Road, Suite 310
                                        Tarrytown, New York  10591
                                        (914) 332-0700
                                        eburger@mpollack.com


## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiff demands a

trial by jury of this action.

Dated:  Tarrytown, New York
          June 7, 2022

                                        MITCHELL POLLACK & ASSOCIATES, PLLC
                                        Attorneys for Plaintiff, Seraph Millar

                                        /s/ *Eileen M. Burger*

                          By.:         _____
                                        Eileen M. Burger, Esq. (EB3002)
                                        150 White Plains Road, Suite 310
                                        Tarrytown, New York  10591
                                        (914) 332-0700
                                        eburger@mpollack.com